12487

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| WILLIE McRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 17 CV 1588 |
| v. | ) | |
| | ) | Judge: Marvin E. Aspen |
| THOMAS ROSS, *et. al.* | ) | |
| | ) | Magistrate Judge: Mary M. Rowland |
| Defendants. | ) | |
| | ) | JURY TRIAL DEMANDED |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF COMPLAINT FOR ADMINISTRATIVE REVIEW

NOW COMES the Plaintiff, WILLIE McRAY, by his attorneys DeAno & Scarry, LLC, and submits the following Brief in Support of Complaint for Administrative Review:

## INTRODUCTION

Plaintiff, Willie McRay, was a police officer for the Bolingbrook Police Department (hereinafter "the Department) for approximately 14 years. During that time, Plaintiff did not have any significant negative disciplinary history. The Director of Public Safety, Thomas Ross, filed charges against Plaintiff with the Village of Bolingbrook Fire & Police Commissioners (hereinafter "the Board") seeking termination of Plaintiff's employment for violating General Rule No. 12 in a number of ways. Plaintiff was accused of (1) failure to obey and execute a lawful order; (2) possession of a controlled substance or medications, (3) maintaining a relationship with his son, who was under indictment or a convicted felon, (4) failure to fully cooperate with a police investigation, (5) failure to comply with all the rules of the department or supervisor, (6)

1

engaging in conduct which adversely affects the department, (7) insubordination (8) failure to maintain working knowledge of laws, policies and procedures, (9) undertaking of self-assigned police action, (10) failure to promptly report the loss of any municipal property and (11) failure to immediately notify the chief of police of any change of address. On February 13, 2017, the Board found Plaintiff guilty of failure to obey and execute a lawful order; possession of a controlled substance or medications, maintaining a relationship with his son, while he was under indictment or was a known felon, failure to fully cooperate with a police investigation, failure to comply with all the rules of the department or supervisor, engaging in conduct which adversely affects the department, insubordination and failure to maintain working knowledge of laws, policies and procedures. Plaintiff was found not guilty of failure to promptly report the loss of any municipal property and failure to immediately notify the chief of police of any change of address. The Board also prematurely determined that Plaintiff should be terminated as a result.

On March 8, 2017, the Board issued Amended Findings and Opinion reinstating Plaintiff's employment and heard evidence to determine the appropriate penalty. After additional hearings, the Board issued the Supplemental Findings and Order on Remedy terminating Plaintiff's employment.

## STATEMENT OF FACTS

Plaintiff was charged with violating the following rules: failure to obey and execute a lawful order; possession of a controlled substance or medications, prohibition on association with a known felon, failure to fully cooperate with a police investigation, failure to comply with all the rules of the department or supervisor, engaging in conduct

2

which adversely affects the department, insubordination and failure to maintain working knowledge of laws, policies and procedures.[1] (VOB 00600-608). The Board summarized the charges as such:

> The factual basis for said charges relates, in summary, to the Respondent's continuous association to an individual (his adult son) who has been convicted of a felony in violation of the Complainant's direct orders and the Rules and Regulations of the Bolingbrook Police Department. The charges also allege that Respondent's association with his adult son and his conduct related thereto have a tendency to destroy public respect and confidence in him and the Department. It is also alleged to have engendered a lack of trust with fellow officers, subordinates and made him a less effective law enforcement officer.
>
> The Respondent is also charged with violations of the Rules and Regulations relating to… failing to contact his patrol commander by 9:00 am each day he was scheduled to work; and being in possession of narcotic medication in violation of the Rules and Regulations of the Bolingbrook Police Department.

(VOB 00679-680).

General Order No. 12, Section VII is the Police Department rule that lists offenses subject to discipline. (VOB 000011-000019). The disciplinary worthy offenses include 62 subparagraphs of offenses. *Id.* In this case, the majority of the claims revolve around violations of General Order No. 12, Section VII(8) (hereinafter "Rule 8"), the prohibition of associating with known felons. (VOB 00680, VOB 00722). Rule 8 states, in pertinent part:

> B. Employees shall avoid regular or continuous associations or dealings with persons they know, or should know, are persons under criminal investigation or indictment, or who have a reputation in the community or the Department for present involvement in felonious or criminal behavior. Exceptions: when as necessary to the performance of

---

[1] Plaintiff was initially charged with violating Rule 7, undertaking of self-assigned police action, but the charge was not adjudicated at the hearing level. He was also charged with violating Rules 29 and 47 and was found not guilty on those charges. As such, the alleged violations of Rules 7, 29 and 47 will not be addressed in this matter.

official duties, or where avoidable because of other family or personal relationships of the employees.

C.     If such family or personal relationships exist, then the employee shall make notification to the Chief of Police, via memorandum.

(VOB 000013).  As described below, the majority of the allegations in this matter are interwoven.

Plaintiff was a police officer for the Department.  He has a son, Jeremy who was either 19 or 20 years old at the time in question.  (VOB 00769).  It is undisputed that that Jeremy is addicted to prescription drugs. Thomas Ross is the Director of Public Safety for the Village of Bolingbrook.  (VOB 00720).  The Director of Public Safety is both the police chief and fire chief and is responsible for hiring, discipline, rules and regulations, policies and procedures and day-to-day operations.  *Id*.  The allegations involved in this matter span the course of a year and a half.

On June 23, 2015, Jeremy pled guilty to a charge of possession with intent to distribute a look-alike substance and received T.A.S.C. probation.  (VOB 01255).  Subsequent to receiving T.A.S.C  probation, Jeremy was involved with a number of interactions with police officers.   On July 13, 2015, Bolingbrook police officers responded to a domestic battery call at Plaintiff's home involving Jeremy and his girlfriend.  (VOB 00764).  Jeremy was not arrested as a result of the call.  (VOB 00843).  On September 12, 2015, Jeremy was arrested for burglary of a motor vehicle.  (VOB 00772).  As a result, Jeremy was incarcerated at Will County Adult Detention Center until April 2016.  (VOB 00768). Within a day or two after Jeremy's arrest for burglary, Director Ross learned that Jeremy was a convicted felon.  (VOB 00758).  Around the same time, Ross also learned that Jeremy had an addiction to drugs.  (VOB 00767).

4

On September 29, 2015, Ross and Commander Dennis Hess met with Plaintiff to discuss Jeremy's arrest. (VOB 00758). Ross explained to Plaintiff that Rule 8 applied to his relationship with Jeremy. *Id.* Plaintiff, while disagreeing that Rule 8 applied to his relationship with his son, indicated that Jeremy did not live with him, *id.*, and instead lived with his mother, Diana McRay, in Plainfield, Illinois. *Id.* After the meeting, Plaintiff submitted a memo to Director Ross stating that Jeremy "will not permanently reside" at Plaintiff's home in Bolingbrook. (VOB 00724, 01269). Ross acknowledged receipt of Plaintiff's September 29, 2015 memo and reiterated that his relationship with his son fell within Rule 8, including subparts B and C. (VOB 01270). Ross's September 29, 2015 memo also stated that Plaintiff was to keep Ross updated of all changes and updates. *Id.* Ross did not discipline Plaintiff for the failure to inform him that Jeremy was a convicted felon before September 2015. (VOB 00760).

In July 2016, the Naperville police did a wellness check at Plaintiff's home because Jeremy had called 911 and hung up. (VOB 00728). The officers traced the call to Plaintiff's home. *Id.* After the incident, Plaintiff met with Ross and Hess. *Id.* Plaintiff again told Ross that Jeremy did not live with him. *Id.* Ross claims that he told Plaintiff that he was not to associate with his son at this time. Plaintiff then submitted another memo to Ross, stating that Jeremy did not reside with him. (VOB 01273).

In August of 2016, while Plaintiff was in Arizona, Jeremy was asked to check on Plaintiff's dogs at Plaintiff's house. (VOB 00966, 01275). Jeremy was not living at Plaintiff's home at the time. (VOB 00966). On or about August 20, 2016 or August 21, 2016, without Plaintiff's knowledge or permission, Jeremy hosted a party at Plaintiff's home. (VOB 00966, 01275). During the party some items were stolen from Plaintiff's

home. *Id*. Afterwards, a woman claimed she was sexually assaulted at the party. (VOB 000602). Plaintiff first became aware of the party and that some items were stolen from his home when he was told about it by Deputy Chief Kenneth Teppel on September 2, 2016. (VOB 00813).

On September 16, 2016, Plaintiff was interrogated regarding his failure to comply with multiple portions of General Order No. 12. (VOB 00605). Subsequent to the interrogation, charges were filed against Plaintiff with the Board. Plaintiff was also placed on administrative leave pending the investigation.

Thereafter, on October 1, 2016, Plaintiff's dog was involved in an altercation with his neighbors' dog. Plaintiff's dog and one of the neighbors' dogs had history of being aggressive towards each other. (VOB 01070). That day, Plaintiff's dog was in Plaintiff's yard first when the neighbors let their dogs out. *Id*. The neighbors' dogs pushed against the fence separating the yards and Plaintiff's dog was able to enter the other yard. *Id*. Plaintiff heard one of the neighbors' dogs barking when she let him out. (VOB 01071). As a result of the altercation, the neighbors' dog was seriously injured.

On October 10, 2016, the owners of the injured dog came to the police station, made a statement and provided photographs and copies of the dog's medical bills. (VOB 00881). The next day, Lt. Rich Hilliard left Plaintiff a voice mail regarding his dog. (VOB 01290). Later, that day, Plaintiff was informed by an officer that his dog needed to be impounded. (VOB 00875). Plaintiff had already given his dog to a friend who lived in Darien, Illinois. (VOB 01290, 00882). Plaintiff informed the officer who called that his dog no longer lived with him. *Id*. Plaintiff said that he did not believe his dog was a vicious dog. (VOB 00875). On October 12, 2016, Plaintiff received via U.S. mail a

notice to appear for vicious animal. (VOB 00875-00876, VOB 01290). At this time, the dog has not been impounded. (VOB 00875, 00882). The Amended Charges were filed thereafter.

## STANDARD OF REVIEW

This Court has supplemental jurisdiction of Plaintiff's administrative review claim pursuant to 28 U.S.C. § 1331. An administrative review includes all questions of law and fact present in the record. *Richard's Tire Co. v. Zehnder*, 295 Ill. App. 3d 48, 56, 229 Ill. Dec. 587, 692 N.E.2d 360 (1998). The applicable standard of review is dependent on whether "the question presented is one of fact, one of law, or a mixed question of law and fact." *AFM Messenger Serv. v. Dep't of Emp't Sec.*, 198 Ill. 2d 380, 390, 261 Ill. Dec. 302, 763 N.E.2d 272 (2001). An agency's finding on a question of law is reviewed de novo. *Richard's Tire Co.*, 295 Ill. App. 3d at 57. Where the case presents a mixed question of law and fact the "clearly erroneous" standard of review applies. *AFM Messenger Serv.*, 198 Ill. 2d at 391.

A court's review of an administrative agency's factual decision to discharge is a two step process. *Walsh v. Board of Fire and Police Comm'rs of Village of Orland Park*, 96 Ill.2d 101, 105 (1983). On administrative review, the court's role is to determine whether the findings and decisions made by the agency are against the manifest weight of the evidence. *Abrahamson v. Ill. Dep't of Prof'l Regulation*, 153 Ill. 2d 76, 88 180 Ill. Dec. 34, 606 N.E.2d 1111 (Ill. 1992). "An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id*. The Court must also determine if the findings of fact "provide a sufficient basis for the agency's decision that cause for discharge does or does not exist." *Id*.

## ARGUMENT

Plaintiff requests that the Court reverse the decision of the Village of Bolingbrook Board of Fire and Police Commissioners (hereinafter "the Board") to terminate Plaintiff's employment with the Village of Bolingbrook Police Department. The Board's decision should be reversed as (1) the charges alleged against Plaintiff were vague and ambiguous in violation of the due process clause, (2) Rule 8 violates Plaintiff's constitutional right to familial association, (3) Rule 8 is unconstitutionally vague and ambiguous, (4) the factual record does not support the findings of the Board and (5) there was insufficient basis for the Board to terminate Plaintiff's employment.

## I.  THE CHARGES LEVELLED AGAINST PLAINTIFF WERE VAGUE AND AMBIGUOUS IN VIOLATION OF THE DUE PROCESS CLAUSE

The findings and decision of the Board should be reversed as the charges against Plaintiff were unconstitutionally vague and ambiguous. While charges in an administrative hearing do not need to be drafted with the same precision required of pleadings in judicial proceedings, *Burns v. Police Board of Chicago*, 104 Ill.App.3d 612, 615 (Ill.App. 1982), they must "be sufficiently clear and specific to allow preparation of a defense." *Id.* Under the due process clause, the administrative process requires: (1) a definite charge, (2) adequate notice and (3) a complete, fair and impartial hearing. *Id.*

In *Nelmark v. Board of Fire & Police Commissioners*, 159 Ill.App.3d 751 (Ill. App. 1987), the Illinois appellate court held that an administrative charge was unconstitutionally vague and ambiguous where the charge involved several separate incidents spanning a substantial period of time and the details of the incidents were not hinted at in the language. *Id.* at 758. The court determined that the charge was not sufficiently drawn so as to notify the plaintiff of the charges leveled against him. *Id.*

Here, the Amended Charges are likewise not sufficiently written to notify Plaintiff of the charges against him and allow him to prepare a defense. General Order No. 12 is the Police Department rule that lists offenses subject to discipline. (VOB 000011-000019). The disciplinary worthy offenses include 62 subparagraphs of offenses. *Id*. The Amended Charges delineate 35 separate factual allegations against Plaintiff, involving several different incidents on occurring on several different dates. (VOB 00600-00608). The time period involved spans the course of a year and a half, from June 23, 2015 until October 1, 2016. After stating the factual allegations, the Amended Charges lists ten different rules that might be applicable. (VOB 00604-00605). However, the charging documents did not identify which factual allegations pertain to each possible offense. The list of possible offenses is followed by 20 statements attributable to Plaintiff, also without identifying the offense or factual allegation the statements applied to. Instead, the Amended Charges seem to purposefully blur the allegations as indicated in Paragraph 34 of the document, which states:

> 34.     McRay's failures to follow General Order No. 12 and *its various provisions and the reasons therefore, separately and together*, exhibit a substantial shortcoming in his continued employment detrimental to the discipline and efficiency of the public service and which the law and sound public opinion recognize as cause for him to be discharged from his position of Sergeant and Police Officer for the Village of Bolingbrook Police Department.

(VOB 00607) (emphasis added).

The Amended Charges alleged against Plaintiff are intentionally vague and ambiguous. As a result, Plaintiff was left to speculate as to the nature of the charges leveled against him. The Amended Charges allege violations of at least 10 different rules over the course of a year and a half. This matter involves several different alleged

incidents occurring on several different days.  A review of the Amended Charges shows that the charges brought against Plaintiff were vague and not sufficiently clear and specific enough so as to allow Plaintiff to know which charges applied to which offense so that he could adequately prepare his defense."  As such, the decision of the Board should be reversed.

## II.    PROHIBITING PLAINTIFF FROM ASSOCIATING WITH HIS SON VIOLATES THE DUE PROCESS CLAUSE

Should the court determine that the charges are sufficiently clear, the Board's findings that Plaintiff violated Rule 8 and corresponding orders should still be reversed as the orders violate the due process clause.  The "freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."  *Moore v. E. Cleveland*, 431 U.S. 494, 499 97 S. Ct. 1932 (1977), citing *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 94 S. Ct. 791 (1974), see also *Dupuy v. Samuels*, 462 F.Supp.2d. 859, 883 (N.D. Ill. 2005) ("It is well-established that choices about marriage, family life, and the upbringing of children are among associational rights the Supreme Court has ranked as of basic importance in our society, rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect.")(internal quotations omitted).  Regulation of a familial relationship is not beyond regulation by the government, however, the court must examine "the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation."  *Id.*  Personal relationships entitled to constitutional protection include marriage, childbirth, raising and educating children and cohabitation with relatives.  *Roberts v. United States Jaycees*, 468 U.S. 609, 619, 104 S. Ct. 3244 (1984).  Where the government "intrudes on choices concerning family living

arrangements," the court must examine the importance of the governmental interests and the extent they are served by the regulation. *Moore*, 431 U.S. at 499. "When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki v. Redhail*, 434 U.S. 374, 388, 98 S. Ct. 673 (1978), see also *Aristotle P. v. Johnson*, 721 F. Supp. 1002, 1006 (N.D. Ill. 1989).

The current matter is analogous to the statute at issue in *Moore v. East Cleveland*, 431 U.S. 494 (1977). In *Moore*, a city housing ordinance limited the occupancy of a dwelling to members of a single family and provided a definition of "family" that was essentially limited to a parents and their children. *Id*. at 495, n.2. The plaintiff in *Moore* lived with her son and her two grandsons. *Moore*, 431 U.S. at 496. The grandchildren were first cousins, not brothers. *Id*. One of the grandchildren had come to live with plaintiff after his mother had died. *Id*. at 496-497. The plaintiff was convicted of violating the city ordinance with respect to one of the grandsons because he was the nephew of her son and not his son. *Id*. The Supreme Court held that the ordinance in *Moore* violated the due process clause of the Fourteenth Amendment and stated:

> East Cleveland, in contrast, has chosen to regulate the occupancy of its housing by slicing deeply into the family itself. This is no mere incidental result of the ordinance. On its face it selects certain categories of relatives who may live together and declares that others may not. In particular, it makes a crime of a grandmother's choice to live with her grandson in circumstances like those presented here.
>
> When a city undertakes such intrusive regulation of the family, neither Belle Terre nor Euclid governs; the usual judicial deference to the legislature is inappropriate. "This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." A host of cases… have consistently acknowledged a "private realm of family life which the state cannot enter."

*Id*. at 498-499 (internal citations omitted). The Court further held that the justifications for the city's ordinance were only marginally served by the ordinance. *Id*. at 499-500.

In the current matter, the Village sought termination of Plaintiff's employment because of his association with his son, Jeremy. (VOB 00823). The majority of the charges and evidence presented involve Plaintiff's relationship with his son, Jeremy. (VOB 000013, 00722). In fact, when asked by Plaintiff could no longer be a police officer, Ross stated:

> He's made the choice to shield his son and be a father. And it was my hope that the two things were not mutually exclusive, that he could work through it and do both, but in this particular instance, he's chosen his son over the department and his ability to be a police officer.

(VOB 00833-00834). Undoubtedly, Plaintiff's relationship with his son was the reason he was terminated from his employment.

It is also clear that the Village attempted to severely limit the relationship between Plaintiff and his son. It is undisputed that Jeremy was either under indictment or a convicted felon while Plaintiff was employed at the Bolingbrook Police Department. Ross testified that since Jeremy is a convicted felon, Plaintiff should not have contact with him. (VOB 00761). He further admitted that he ordered Plaintiff "[n]ot to associate with his son anymore, (VOB 00825), and stated that Plaintiff was prohibited from having regular or continuous association with his son although he did not set clear parameters regarding that association. (VOB 00762). Clearly, Ross's intent was to significantly limit Plaintiff's familial association rights. He testified:

> Q.     Okay. And how did you expect Sergeant McRay to limit that contact with Jeremy?

A. In frequency, duration, subject matter. I think there's a difference, his son's in rehab, we did at one point have a conversation, you know, if he's in rehab and there's a parents' night or graduation from rehab or something, there may be a very small window where that would be appropriate or he could come to us and let us know that. So Sergeant McRay's issue was are you telling me a hundred percent that I can never see my son again, because if you're telling me that, that's wrong. And I said of course not. There are a lot of reasons why you might have to contact with your son, but they're severely limited and you've gotten yourself this far into trouble so far and we need to talk about that.

Q. When you say that they're severely limited, did you tell Sergeant McRay how his contact with Jeremy should be limited?

A. No, I told Sergeant McRay in writing that he needs to keep me updated of any changes.

(VOB 00769). However, Director Ross testified that Jeremy was not supposed to be at Plaintiff's house and that they were not supposed to spend time together. (VOB 00770). At some point, Ross told Plaintiff that Jeremy could not live or stay with him. (VOB 00773). Based on his on interpretation of Rule 8, Ross believed he could limit Plaintiff's relationship with Jeremy because Jeremy was not a minor child. (VOB 00761). While Ross admitted that there is nothing in the general order prohibiting Jeremy from living with his father, Ross still told Plaintiff that Jeremy could not live with him. (VOB 00774).

Like the city in *Moore*, the Village prohibited Plaintiff from associating with his son. The right to familial association is a fundamental right. At issue here is the relative value of a vague department rule whose only valid objective should be to keep police officers from befriending criminals, and the sanctity of the constitutionally protected parent-child relationship. No matter the age of the child, a relationship with both parents is essential, even more so in the case of a troubled youth. To deny Jeremy the advice, guidance and companionship of his father at this time in his life serves no legitimate

police department goal, but is potentially devastating to Jeremy. The Village cannot show that it has a sufficiently important interest in interfering with Plaintiff's familial association rights that is closely tailored to effectuate said interests only. As such, the Village's prohibition and/or severe limitation on Plaintiff's family association rights violates the due process clause. As such, the decision of the Board as to Rule 8 and any orders prohibiting Plaintiff from associating with his son should be reversed.

## III.     RULE 8 IS UNCONSTITUTIONALLY VAGUE AND AMBIGIOUS

In the alternative, Plaintiff cannot be found to have violated the Village's felon association rule as Rule 8 is unconstitutionally vague and ambiguous. "An administrative agency derives its power to act solely from the statute by which it was created." *Chemed Corp. v. State*, 186 Ill.App.3d 402, 410 (Ill.App. 1989). Administrative regulations have a presumption of validity. *Id.* at 411. Administrative regulations and statutes are governed by the same construction standards. *Id.* A statutory term that is not specifically defined must be given the ordinary and popularly understood meaning. *Id.* "[T]he term must be given its full meaning, not the narrowest possible meaning." *Id.* The Illinois appellate court explained:

> A statute is unconstitutionally vague if its terms are so indefinite that persons of common intelligence must necessarily guess at its meaning and differ as to its application. To hold a statute unconstitutionally vague, its terms must be so ill-defined that their meaning will be determined by the opinions and whims of the trier of fact rather than by any objective criteria. Vague laws may trap the innocent by not providing fair warning of their prohibitions. A statute, however, does not violate due process on grounds of vagueness if the duty or obligation imposed by the statute is prescribed in terms definite enough to serve as a guide to those who must comply with it. There is a strong presumption of the constitutionality of a statute, and the burden of demonstrating its invalidity is on the parties challenging it.

*Rackow v. Human Rights Commission*, 152 Ill.App.3d 1046, 1057 (Ill.App. 1987). A statute will not be considered void for vagueness if the rights and duties imposed in the act were sufficiently definite so as to "serve as a guide to those who must comply with it." *Chemed Corp. v. State*, 186 Ill.App.3d at 419.

In this case, there are both multiple interpretations of Rule 8 as well as uncertainty as to how Rule 8 is to be applied. As stated above, Rule 8 prohibits association with known felons. However, Rule 8(B) allows for an exception "where unavoidable because of other family or personal relationships of the employees." (VOB 000013). Director Ross admitted that Plaintiff's relationship with Jeremy's applies to part B and C of Rule 8. (VOB 000353, 01270). However, Director Ross also argued that the father-son relationship between Plaintiff and Jeremy does not fall into the exception in subparagraph B based on his own interpretation of the rule. (VOB 00769, 00761). Ross determined that the exception in part B did not apply because Jeremy is an adult. (VOB 00776). He further testified that his interpretation of the rule governs because he wrote it and is the chief of police. (VOB 00834). Director Ross testified:

> Q. General Order No. 12 Section 7 Paragraph 8, why did the exception not apply?
>
> A. The exception doesn't apply because and it's a case by case interpretation, but when I say it doesn't apply, it doesn't apply. It's an interpretive general order. And in this particular instance, I have an adult that's a convicted felon that's under indictment. I was asked if it could apply. I told him it didn't apply. The exception doesn't apply. It's not unplanned. It's not incidental. Done.

(VOB 00838). Based on the Director's own words, it is apparent that multiple interpretations of Rule 8 and its exceptions could and were made.

Additionally, the language of Rule 8 also leaves uncertainty as to how and when the rule would be applied. Despite stating that his interpretation of the rule governed, Ross did not know if he could enforce Rule 8 or "how far the parameters of that general order would go." (VOB 00773). Even though Ross admitted that there is nothing in Rule 8 that says Plaintiff and Jeremy could not live together, (VOB 00774), he testified that Jeremy was not supposed to be at Plaintiff's house and that they were not supposed to spend time together. (VOB 00770). Ross never told Plaintiff how to limit his contact with Jeremy, instead he merely told Plaintiff that he needed to keep Ross updated on any changes. (VOB 000769). Ross testified:

> Q.    Okay. And how did you expect Sergeant McRay to limit that contact with Jeremy?
>
> A.    In frequency, duration, subject matter. I think there's a difference, his son's in rehab, we did at one point have a conversation, you know, if he's in rehab and there's a parents' night or graduation from rehab or something, there may be a very small window where that would be appropriate or he could come to us and let us know that. So Sergeant McRay's issue was are you telling me a hundred percent that I can never see my son again, because if you're telling me that, that's wrong. And I said of course not. There are a lot of reasons why you might have to contact with your son, but they're severely limited and you've gotten yourself this far into trouble so far and we need to talk about that.
>
> Q.    When you say that they're severely limited, did you tell Sergeant McRay how his contact with Jeremy should be limited?
>
> A.    No, I told Sergeant McRay in writing that he needs to keep me updated of any changes.

(VOB 00769). As a result of the confusion, Plaintiff was in fact not given fair warning as to what constituted a violation of Rule 8. Plaintiff best described the issue with Rule 8 when he said:

> Q.    And because of that training, you feel that what you have done with Jeremy does not violate this order?

A.    No, I feel being a father to my son doesn't violate this order how it's written.  There's nothing in this general order that says anything about the age of the person.  There's nothing in this general order that says anything about the residency of this person.  So if we're just about to wildly interpret things, then how could any officer do their job and follow any general order if every general order is open to the director's interpretation?  How can these guys properly do their job?  So you're telling me that how it's written, I should not follow this general order the way it's written?  I'm reading it.  I followed it.  It says where unavoidable, where personal relationship and family.  He's part of my family.  How should I interpret this general order?

(VOB 01015-01016).

Based on the evidence, it is clear that Rule 8 is unconstitutionally vague and ambiguous.  Even Ross, who wrote the general orders, could not explain the parameters of the rule or whether he could enforce it.  The fact that the Rule is subject to Ross' interpretation alone, shows that the rule is vague and ambiguous as written.  The language of Rule 8 does not provide a definite enough description to guide employees who must comply with the Rule.  Rule 8 is subject to many different interpretations.  As such, the decision of the Board regarding Rule 8 should be reversed.

## IV.    THE FACTUAL RECORD DOES NOT SUPPORT THE BOARD'S DECISION

Assuming the Court finds that the charges alleged against Plaintiff were sufficiently clear, the Board's decision should still be overturned as the factual record does not support the Board's decision.  The Board sustained most of the charges alleged against Plaintiff and subsequently terminated his employment as a result.  The Board found Plaintiff guilty of disobedience of orders (Rule 2), Possession and/or use of a controlled substance or medication (Rule 4), prohibited association/frequenting with a known felon (Rule 8), failure to cooperate with a police investigation (Rule 9), violation

of the duty to read, understand and comply with orders (Rule 22), engaging in on or off duty conduct which adversely affects the Department (Rule 33), insubordination (Rule 36) and failure to maintain a working knowledge of the laws, policy and procedures (Rule 55). (VOB 000011-000019). The sustained charges can be grouped into six different categories (1) Plaintiff's association with his son and the corresponding orders regarding said association, (2) the incident involving Plaintiff's dog, (3) Plaintiff's withholding a controlled substance from his son, (4) Plaintiff's cooperation with police investigations (5) Plaintiff's alleged engaging in activity that adversely affects the Department and (6) Plaintiff's alleged failure to maintain a working knowledge of the laws, policies and procedures of the Department.

### A.    Plaintiff's Association With His Son

The majority of the allegations involve Plaintiff's relationship with his son, Jeremy. The Village contends that Plaintiff violated both Rule 8 and his superior's orders not to associate with Jeremy. However, the factual record does not support the Board's finding that Plaintiff violated either Rule 8 or his superiors' orders not to associate with Jeremy.

Rule 8 prohibits regular and continuous association with a person who is under criminal investigation, indictment or a convicted felon. (VOB 000013). Section B includes an exception "where unavoidable because of other family or personal relationships of the employees." *Id*. Section C states that where such family relationships exist, the employee shall notify the Chief of Police via memorandum. *Id*. Rule 8 does not provide any details as to when said memorandum should be provided or any further guidance.

With respect to the alleged orders given to Plaintiff, the Amended Charges do not specify which rule Plaintiff has supposedly violated. General Order No. 12, Section VII(2) (hereinafter "Rule 2") involves the failure to obey and fully execute a *lawful* order. (VOB 000012) (emphasis added). General Order No. 12, Section VII(22) (hereinafter "Rule 22") pertains to the failure to read, understand or comply with orders of a supervisor. (VOB 000015). General Order No. 12, Section VII(36) (hereinafter "Rule 36) prohibits insubordination, the failure or deliberate refusal to obey a *lawful* order. (VOB 000017). First, as discussed above, to the extent that allegations against Plaintiff pertain to the failure to obey a lawful order, the Village has failed to prove Plaintiff violated said rules as any order preventing Plaintiff from associating with his son violates the due process clause and is unlawful as discussed above. Second, for the reasons stated below, the factual record does not support the findings of the Board for the remaining allegations.

The Village contends that Plaintiff violated both Rule 8 and subsequent orders not to associate with Jeremy by continuing to see Jeremy on a regular/continuing basis, allowing Jeremy to either live or be at his Plaintiff's on occasion and by failing to write a memorandum indicating that Jeremy was a convicted felon. However the factual record does not support the idea that (1) Plaintiff was given an actual order not to associate with his son, (2) Plaintiff's interactions with Jeremy were regular or continuous, (3) Jeremy lived with Plaintiff and (4) Plaintiff was required to write a memorandum explaining that Jeremy was a convicted felon and failed to do so.

On June 23, 2015, Jeremy pled guilty to a charge of possession with intent to distribute a look-alike substance and received T.A.S.C. probation. (VOB 01255).

Plaintiff's understanding at the time was that the felony conviction would not go into effect unless Jeremy failed to complete the outpatient therapy. (VOB 01002). As a result, Plaintiff did not inform his supervisors of the conviction. *Id.*

On July 13, 2015, Bolingbrook police officers responded to a domestic battery call at Plaintiff's home involving Jeremy and his girlfriend. (VOB 00764). No complaint was filed as a result of the call, *id.*, and Jeremy was not arrested that day. (VOB 00843). Plaintiff was not involved in the incident, (VOB 00764-765), and arrived home after the officers had already responded. (VOB 00840).

In September 2015, Director Ross learned that Jeremy was a convicted felon, (VOB 00758), as the result of Jeremy being arrested for burglary of a motor vehicle on September 12, 2015. (VOB 00772). Around the same time, Ross also learned that Jeremy had an addiction to drugs. (VOB 00767). On September 29, 2015, Ross and Commander Dennis Hess met with Plaintiff to discuss Jeremy's arrest. (VOB 00758). Ross explained to Plaintiff that Rule 8 applied to his relationship with Jeremy since Jeremy was an adult. *Id.* Plaintiff disagreed that Rule 8 applied to his relationship with his son and stated that Jeremy did not live with him. *Id.* Plaintiff explained that Jeremy lived with his mother, Diana McRay, in Plainfied, Illinois. *Id.* Furthermore, Plaintiff submitted a memo to Director Ross after the meeting stating that Jeremy "will not permanently reside" at Plaintiff's home in Bolingbrook. (VOB 00724, 01269). Plaintiff's September 29, 2015 memo to Director Ross stated:

> I am submitting this memorandum to inform you that prior to my son's (Jeremy McRay) arrest on 9/13/15, he did not permanently reside at my residence. He lives in Plainfield with his mother (Diana McRay) a majority of the time. He was temporarily staying with me as a result of verbal altercation that occurred between him and his mother on August 22nd. Jeremy will continue to live in Plainfield or some other address of

> his choosing however he will not permanently reside at my Bolingbrook residence.

(VOB 01269). Ross acknowledged receipt of Plaintiff's September 29, 2015 memo and reiterated that Plaintiff's relationship with his son fell within Rule 8, including subparts B and C. (VOB 01270). Ross's September 29, 2015 memo also stated that Plaintiff was to keep Ross updated of all changes and updates. *Id*. When asked to describe what he meant by requesting to be kept updated on any changes, Ross merely repeated himself. (VOB 00725). Ross did, however, acknowledge that his request was not an explicit order. (VOB 00726). Ross testified that he meant that Plaintiff could not associate with a known felon, someone under criminal investigation or someone under indictment. (VOB 00724). Ross did not tell Plaintiff that he was not to have any telephone communications with Jeremy while he was in the county detention center. (VOB 00762). Ross also did not tell Plaintiff how his contact with Jeremy should be limited. (VOB 00769). Additionally, he did not discipline Plaintiff for the failure to inform him that Jeremy was a convicted felon before September 2015. (VOB 00760).

In April, 2016 Jeremy was released from the Will County Adult Detention Center on bond. (VOB 00768). A few months later, in July 2016, the Naperville police did a wellness check at Plaintiff's home. (VOB 00728). Jeremy had called 911 and hung up. *Id*. The officers traced the call to Plaintiff's home. *Id*. Subsequently, Plaintiff met with Ross and Hess to discuss the incident. *Id*. Plaintiff again told Ross that Jeremy did not live with him. *Id*. Ross testified that he told Plaintiff that he was not to associate with his son at this time. When asked what was said at the meeting, Hess described what Ross told Plaintiff, saying:

> Q.    Okay.  During that meeting, was Sergeant McRay ordered not to associate with Jeremy?
>
> A.    No, not to – not to not associate with him, but basically, I mean, he could speak to him on the phone, things like that, but Jeremy could not stay there, could not – could not – he would have to avoid situations where, you know, with him, personal contact, things like that, staying in his home, things like that.

(VOB 00896).    After the July 2016 meeting with Ross and Hess, Plaintiff submitted another memo to Ross, stating that Jeremy did not reside with him.  (VOB 01273).  Plaintiff's July 13, 2016 memo also stated that he allowed Jeremy to stay the night that day because he got a flat tire and was going to fix the tire in the morning.  *Id*.

In August of 2016 while in Arizona, Plaintiff telephoned Jeremy and asked him to check on his dogs, (VOB 00966, 01275), because Plaintiff's dog sitter had a scheduling conflict.  (VOB 01004).  Jeremy was not staying at his home at the time.  (VOB 00966).  Jeremy had the garage code to Plaintiff's house, but did not have a key.  *Id*.  Ross has no information that suggests Plaintiff gave Jeremy permission to host the party.  (VOB 00810).  Ross was aware that Plaintiff was in Arizona at the time.  *Id*.

Without Plaintiff's knowledge or permission, on or about August 20, 2016 or August 21, 2016, Jeremy hosted a party at Plaintiff's home.  (VOB 00966, 01275).  During the party some items were stolen from Plaintiff's home.  *Id*.  Ross did not have any personal knowledge that Plaintiff even knew items were stolen from his home between August 20th and September 2, 2016.  (VOB 00813).  Plaintiff first became aware that one of his badges and hat shield were missing on September 2, 2016 when he was told about it by Chief Deputy Teppel.  (VOB 00813).  Ross admitted that he held Plaintiff responsible for everything that happened at the party because Plaintiff gave Jeremy access to his home and Jeremy violated Plaintiff's trust.  (VOB 00811).

Based on the evidence stated above, the record does not support a finding that Plaintiff was given an order not to associate with his son. Since Ross did not learn of Jeremy's criminal history until September 2015, the first time any such order could have been given to Plaintiff was after September 2015. When Ross and Hess met with Plaintiff to discuss Jeremy's arrest, Ross told Plaintiff that Rule 8 was applicable, but Plaintiff told him that Jeremy did not live with him. Ross then told Plaintiff to keep him updated of any changes, which Ross admitted was not an order. Ross did not provide any further guidance to Plaintiff as to how he was supposed to change his relationship with his son. The next time Plaintiff allegedly was ordered not to associate with Jeremy occurred July of 2016. At that time, despite Ross allegedly telling Plaintiff not to associate with his son, Hess's description of the conversation does not make it clear what Plaintiff was told. (VOB 00896). Ross did not give Plaintiff a direct order that he could not talk to Jeremy. (VOB 00773). There is no evidence that Plaintiff was given any other orders not to associate with his son beyond the alleged orders that were given on the September 2015 and July 2016 dates. As such, the factual record does not support the claim that Plaintiff was even given an order not to live with or associate with his son.

As to Rule 8, the factual record also does not demonstrate that Plaintiff violated the rule. For example, Ross admitted that Rule 8 does not imply "100 percent no contact." (VOB 00762). Instead, Ross explained that the rule pertains to regular or continuous association and "goes to motive, length, [and] frequency." *Id.* Ross said he drew the line at "regular or continuous associations or dealings." (VOB 00770). He also admitted there is nothing in Rule 8 that says that Plaintiff and Jeremy cannot live together. (VOB 00774). However, even under Ross's interpretation of Rule 8, the

factual record does not support a finding that Plaintiff and Jeremy had regular or continuous associations.

Over the course of a year, the Village only identified the four above instances of contact between Plaintiff and his son as violating Rule 8. Plaintiff was not even at home when two of the incidents occurred. Furthermore, Ross claims he included the July 13, 2015 date in the charges because it was a day that they knew Jeremy was at Plaintiff's home. (VOB 0766). Based on the factual record, it has not been proven that Plaintiff even associated, stayed or lived with his son on a regular and/or continuous manner. As such, the Board's decision should be reversed.

Additionally, the Village failed to prove that Jeremy lived with Plaintiff. Plaintiff testified that Jeremy no longer lived with him at the Bolingbrook home since before 2012, before he divorced. (VOB 00960). Prior to his divorce, his ex-wife and his two sons lived at the home. *Id.* Plaintiff's ex-wife, Diana McRay, testified that she has lived in Plainfield since January of 2013. (VOB 01019-01020). She stated that Jeremy has lived with her since she moved out of Plaintiff's home in 2011. (VOB 01020). After the divorce, Diana was the custodial parent of Jeremy although he would occasionally spend the night at Plaintiff's home where Jeremy had a bedroom. (VOB 01020-01021). It is the same bedroom Jeremy had prior to the divorce. (VOB 01021). Jeremy's permanent residence since January 2013 was in Plainfield. *Id.* Jeremy has stayed with Plaintiff on numerous occasions since 2014. (VOB 00963). Jeremy had the garage code to his house, but did not have a key. (VOB 00966). Diana testified that Jeremy has extremely severe ADHD and believes he told police that he lives with Plaintiff because he was in

trouble.  (VOB 01022).  Based on the evidence in the record, the Village has not proven that Jeremy lives with his father.  As such, the decision of the Board should be reversed.

Finally, the factual record does not support the idea that Plaintiff should have or did not submit a memorandum to Ross in violation of Rule 8(C).  In his zeal to terminate Plaintiff, Ross asserted contrary arguments that: (1) the family exception in section B does not apply to Plaintiff's relationship with his son because Jeremy is an adult (VOB 00726, 00769) and (2) that Plaintiff did not provide a memorandum notifying him of Jeremy's criminal history in violation of section C.  (VOB 00725).  However, section C clearly states "If such family or personal relationships exist, then the employee shall make notification to the Chief of Police, via memorandum."  (VOB 000013).  Since Ross has repeatedly asserted that Section B does not apply to Plaintiff's relationship with Jeremy, the Village cannot now claim that Plaintiff failed to comply with the requirements of Section C.  Furthermore, as stated above, Plaintiff submitted a number of memos to Ross explaining the nature of the relationship with his son.  Each memo corresponds to a meeting with Ross regarding the criminal history of Jeremy.  Therefore, it is evident Ross was aware of both Jeremy's criminal history and the nature of Plaintiff's relationship with his son.  Accordingly, the factual record does not support the findings of the Board and the decision should be dismissed.

### B. Allegations Regarding Plaintiff's Dog

The Amended Charges also describe an incident involving Plaintiff's dog.  The charges claim that Plaintiff's dog was involved in a fight with his neighbor's dog resulting in the dog's death.  (VOB 00603). The Village further claims it investigated the incident and issued Plaintiff a citation for violating the Village's vicious dog ordinance.

(VOB 00603).  As a result, Plaintiff was required to turn over his dog to the Village for impoundment.  (VOB 00604).  The Village claims that Plaintiff refused to turn his dog over to the Village.  Since the charges are not clear, Plaintiff does not know which rules he is alleged to have violated based on these factual allegations.  However, even though the alleged violations are not clear, the Village still has not proven that Plaintiff violated the vicious dog ordinance.

Under the Village's dog ordinance, a "vicious dog" is defined as "Any individual dog that, *when unprovoked*, attacks a human being or other companion animal either on public or private property and inflicts serious physical injury or death."  (VOB 01282)(emphasis added).  The ordinance also states that no owner shall sell or give away a vicious dog.  (VOB 01285).

Officer Linda Laketa is the animal control supervisor for the Bolingbrook Police Department.  (VOB 00873). Laketa received a vicious dog report on October 3, 2016.  (VOB 00878-00879).  It was her understanding that the incident involved a serious injury to another dog.  (VOB 00874).  Based on the report, Laketa believed that Plaintiff's dog broke through a fence and attacked his neighbor's dog.  *Id*. She found the report in her mailbox when she arrived to work on a Monday.  (VOB 00874).  The incident occurred on the preceding Saturday.  *Id*.  Pursuant to the vicious/dangerous animal ordinance, Officer Laketa testified that where one dog is seriously injured by another dog, the dog would normally be impounded.  (VOB 00874).  Typically, the dog owner is given a hearing letter to impound the dog.  (VOB 00880).  Under in the Village ordinance, the hearing comes after the dog has been impounded.  (VOB 00880).

Laketa talked to the owners of the injured dog for the first time on October 3, 2016, the day she received the report. (VOB 00875, 01290). On October 10, 2016, the owners of the injured dog came to the police station, made a statement and provided Laketa with photographs and copies of medical bills. (VOB 00881). On October 11, 2016, Lt. Rich Hilliard left a voice mail with Plaintiff stating that he needed to get in touch with Laketa regarding his dog. (VOB 01290). Laketa knew that Plaintiff was on administrative leave pending investigation at the time. (VOB 00880). Later, that day, Laketa informed Plaintiff via text message that she needed to impound his dog pursuant to the vicious dog ordinance. (VOB 00875). Plaintiff informed Laketa that he had already given his dog to a friend who lived in Darien, Illinois. (VOB 01290, 00882). Plaintiff also told Laketa that he did not believe his dog was a vicious dog. (VOB 00875). On October 12, 2016, Laketa issued a notice to appear for vicious animal to Plaintiff. (VOB 00875-00876, VOB 01290). She mailed the notice to Plaintiff. *Id*. In this case, she did not impound the dog because she was told by Plaintiff that the dog was no longer in Bolingbrook. (VOB 00875, 00882).

Plaintiff testified that his dog and the neighbors' dog had history of being aggressive towards each other because neither of them is neutered. (VOB 01070). As a result, the he and the neighbors had an agreement not to let their respective dogs out while the other dog was already out. *Id*. That day, Plaintiff's dog was in the yard first. *Id*. While Plaintiff's dog was in the yard, the neighbors let their dogs out. *Id*. The dogs pushed against the fence and Plaintiff's dog got into the other yard. *Id*. Plaintiff testified that his dog was provoked because he heard the neighbors' dog barking when she let him out. (VOB 01071). The incident happened on October 1, 2016. *Id*. Plaintiff did not

27

know the neighbors filed a report until Lt. Rich Hilliard called him about it on October 11, 2016. (VOB 01072). Plaintiff had already given his dog away when he talked to Lt. Hilliard. *Id.* Plaintiff gave his dog to his friend in Darien because he did not want any further incidents between his dog and his neighbors' dogs. (VOB 01000). He later had to give the dog to his ex-sister-in-law in Wisconsin. *Id.*

The police report is the only evidence that Plaintiff's dog attacked the neighbor's dog unprovoked. (VOB 00879). However, the report was authored by Laketa, an officer who did not observe the incident. *Id.* Laketa admitted she did not know why Plaintiff's dog broke through the fence and fought the other dog. *Id.* She admitted that she knew the neighbors' dogs had come onto Plaintiff's property many times. (VOB 00882-00883). She admitted the owner of the injured dog was bit by her own animal during this incident. (VOB 00881). She also admitted that if Plaintiff's dog was provoked and broke through the fence it would not be considered a vicious dog. (VOB 00880).

Clearly, the factual record fails to show that Plaintiff dog was a vicious dog. Per the statute, a vicious dog would have to attack another *unprovoked*. There is no evidence that Plaintiff's dog made an unprovoked attack. In fact, the evidence suggests that Plaintiff's dog was actually provoked by the neighbors' dogs. Since Plaintiff's dog was likely provoked, the dog would not meet the definition of a vicious dog and Plaintiff was not in violation of the statute for removing his dog from Bolingbrook to live with friends. Therefore, the factual record does not support the finding of the Board and said decision should be reversed.

### C. Allegations of Possession/Use of a Controlled Substance

The Amended Charges state that upon a search of Plaintiff's desk at the Bolingbrook Police Department, officers found a bottle of prescription medication that was prescribed to Jeremy. (VOB 00603). However, it is evident the charge against Plaintiff regarding this incident is against the spirit of Rule 4 and therefore the decision of the Board should be dismissed.

Ross learned that Jeremy had an addiction to drugs in September of 2016. (VOB 00767). Plaintiff testified at his interrogation that his son was addicted to prescription drugs. (VOB 00816). Plaintiff stated that he had possession of the prescription to keep it away from his son to prevent Jeremy from abusing the drug. (VOB 00816). Ross recognized that Plaintiff had the best intentions in keeping Jeremy's prescription in his desk. (VOB 00816). He also acknowledged that under the law, Plaintiff could have possessed prescription medication when picking it up from a pharmacy for his son. (VOB 00816). Additionally, Ross did not suspect that Plaintiff was abusing the drugs that were located in his desk drawer. (VOB 00817).

The general rule prohibiting the possession or use of a controlled substance at work is designed to prevent officers from being impaired on the job. In this instance, Ross knew that Plaintiff's son had a drug addiction. Furthermore, Ross did not believe that Plaintiff was abusing the drugs. To punish Plaintiff for trying to prevent his son from abusing prescription drugs is contrary to the spirit of the rule. Accordingly, the decision of the Board should be reversed.

### D. Allegations Concerning Plaintiff's Cooperation With Police Investigations

The Amended Charges mention at least four separate police investigations (burglary to a motor vehicle, contact by the Naperville Police Department regarding a

911 call, alleged crimes that occurred as a result of a party at Plaintiff's house on August 20, 2016 and the incident involving Plaintiff's dog). (VOB 00601-00603). The testimony at the hearing also revealed internal investigations of Plaintiff's conduct and an investigation by the Illinois State Police. (VOB 00726-00727). Nonetheless, the charge of failure to cooperate with a police investigation fails to designate which investigation Plaintiff allegedly failed to cooperate with. Despite the uncertainty as to the allegations against Plaintiff with respect to violations of Rule 22, the factual record still does not support the Board's finding that Plaintiff failed to cooperate with a police investigation.

General Order No. 12, Section VII(9) (hereinafter "Rule 9") involves the failure to fully cooperate with a police investigation. (VOB 000013). Based on the factual record, it is evident that Plaintiff met with Bolingbrook command staff, the Illinois State Police and other agencies several times over the court of the year and a half.

On July 13, 2015, Sgt. Scott Lustick responded to a call at Plaintiff's home involving Jeremy and his girlfriend. (VOB 00839-00840). Plaintiff arrived home after the officers responded. (VOB 00840, 00842). He not only spoke to Sgt. Lustick, he let the officers in his home where Jeremy was located. (VOB 00840). Sgt. Lustick stated that Plaintiff was cooperative with his requests. (VOB 00842).

The initial internal affairs investigation occurred in September 2015. (VOB 01271, 00783). The subject of those interrogations was Plaintiff's conversations with his son while he was at Will County Adult Detention. (VOB 01045). Ross admits that Plaintiff cooperated with that investigation. (VOB 00783). Ross did not have any evidence that Plaintiff did not cooperate. *Id.*

On April 15, 2016, agents from the Illinois State Police came to the Bolingbrook Police Department to serve a search warrant on Plaintiff to search his cell phone as a result of conversations between himself and Jeremy at the Will County jail. (VOB 00778-00779). Ross admits that Plaintiff cooperated with the agents and answered their questions without an attorney. (VOB 01271). Plaintiff also turned over his cell phone. (VOB 00780).

Plaintiff met with Ross and Hess in July 2016 to discuss an incident involving his son where the Naperville Police Department did a wellness check at Plaintiff's home after Jeremy called 911 and hung up. (VOB 00728). After the meeting, Plaintiff wrote and submitted another memorandum explaining the incident. (VOB 01273).

Next, the Department conducted an ongoing criminal investigation into crimes that allegedly occurred at Plaintiff's home in August of 2016. (VOB 00729). The investigation included the possibility that items were stolen from Plaintiff's home. *Id*. Plaintiff wrote and submitted a memo on September 7, 2016 indicating that he was informed that his hat shield and badge may have been stolen from his home. (VOB 01275). The memo further stated that he was in Arizona when the items were stolen and he did not know about or authorize the party in his home. *Id*. He further stated that he was unable to locate the badge and hat shield after searching his home, including in sealed moving boxes. *Id*.

On September 2, 2016 Plaintiff first became aware that one of his badges and hat shield were missing from his home when he was told about it by Deputy Chief Kenneth Teppel. (VOB 00813). Hess and Teppel went to Plaintiff's home to determine if he had his uniforms and badges on September 2, 2016. (VOB 00935). Plaintiff was not at home

at the time but Hess was able to contact Plaintiff on the phone while they were still at the home. (VOB 00936). Plaintiff told him he would be home in an hour. (VOB 00936). Teppel testified that he told Plaintiff that a badge and hat shield were stolen. (VOB 01048). Plaintiff told Teppel that he was in the process of moving and that the home was in disarray. (VOB 01048). Teppel then ordered Plaintiff to bring all of his uniforms to the Department, which he did later that evening. (VOB 00937). He also sent Teppel a picture of the uniforms. (VOB 01048). He never made a burglary report because he was notified of the incident by his own department and they were aware of who stole the items. (VOB 01007).

Then on September 16, 2016, Plaintiff was subjected to a formal interrogation based on a complaint initiated by Ross. (VOB 00756). At the time of the interrogation, he did not know that certain items were stolen from his home. (VOB 00967). Within a day or two before his interrogation, Plaintiff was searching for and assisting his son into rehab for his drug addiction. (VOB 00999).

Curiously, Ross did not know if anyone from the Department ever asked Plaintiff to enter his home for the purpose of viewing the scene of the alleged sexual assault that occurred at his home. (VOB 00824). However, Plaintiff testified that no one from the Department ever contacted him about entering his home to investigate the alleged crime scene. (VOB 01005). Yet to this day, Plaintiff has never been told how he hindered the investigation. (VOB 01006).

Based on the factual record, Plaintiff was involved in numerous police investigations. Although, the charges do not indicate which investigations he allegedly failed to fully cooperate with, it is clear from the above that Plaintiff cooperated with

32

each of the investigations. As such, the factual record does not support the findings and the decision of the Board should be reversed.

### E.     Allegations that Plaintiff's Conduct Adversely Affected the Department

The Amended Charges assert that Plaintiff's on and/or off duty conduct adversely impacted the Department. Again, the charges do not indicate how Plaintiff allegedly violated this rule. However, even though the charges are not clear, the factual record does not support the Board's finding the Plaintiff's conduct adversely affected the Department.

General Order No. 12, Section VII(33) (hereinafter "Rule 33") concerns conduct, either on or off duty, that adversely affects the Department. (VOB 000016). The Village claims that Plaintiff's behavior over the last year and a half negatively impacted their relationship with other police agencies, specifically Naperville Police Department, the Illinois State Police, and Will County. (VOB 728-00729). However, the Village did not present one piece of evidence or testimony from any of the referenced agencies to support this claim. Instead, they relied upon the self-serving testimony of the same command staff members who were seeking to terminate Plaintiff. In like manner, Ross testified that Plaintiff's actions damaged the Department's reputation in the community and cited as an example a conversation with an unnamed man at a neighborhood watch meeting. (VOB 00731-00732). Ross claims that this man expressed concern that Jeremy would receive favorable treatment on his burglary charge because his father was a police officer. (VOB 00732). Ross claims he reassured this anonymous man that Jeremy would not receive favorable treatment. *Id*. However, at the hearing, the Village did not present any

evidence, aside from the command staff's own self serving testimony that the community looked at the Department in a negative light due to Plaintiff's actions.

Ross also claimed that Plaintiff's actions adversely impacted the officers in the Department. (VOB 00732). Again, the factual record contains no proof of this claim other than the testimony of people directly involved in bringing disciplinary charges against Plaintiff. Instead, the record demonstrates that Ross is acting as judge, jury and executioner in this matter. The record does not support the Board's finding that Plaintiff's behavior violated Rule 33 and it should be reversed.

**F.      Plaintiff's Alleged Failure to Maintain a Working Knowledge of the Laws, Policies and Procedures of the Department**

Finally, the factual record does not support a finding that Plaintiff violated General Order No. 12, Section VII(55) (hereinafter "Rule 55"), which involves the failure to establish and maintain a working knowledge of the laws, polices and procedures of the Department. (VOB 000019). First, the Amended Charges fails to mention any rule, law, policy, procedure, etc. that Plaintiff had no knowledge of. In fact, the Amended Charges explicitly state that Plaintiff admitted he was aware of the General Orders. (VOB 00605). Despite the Village's failure to provide any factual allegations asserting that Plaintiff was not knowledgeable about some law, rule, policy or procedure, the factual record does not support the finding by the Board that Plaintiff violated Rule 55.

**V.      THE EVIDENCE IS INSUFFICIENT TO WARRANT TERMINATION OF PLAINTIFF'S EMPLOYMENT**

Finally, in the event the Court finds that the findings and decisions of the Board are not against the manifest weight of the evidence, the Court should still reverse the decision to terminate Plaintiff's employment. As stated above, after making a

determination regarding the Board's findings and decisions, the Court must then determine if the findings of fact provide a sufficient basis for the agency's decision that cause for the termination does or does not exist. *Id.*, *Chambers v. Flota*, 191 Ill. App. 3d at 606.

In the current matter, the Board initially erroneously made the decision to terminate Plaintiff's employment prior to the presentment of evidence regarding punishment on February 13, 2017. (VOB 00647, 01190). Even after a hearing on the penalty phase, the only evidence indicating that Plaintiff cannot serve as a police officer comes from the self-serving testimony of Ross, the very person seeking Plaintiff's termination. No evidence was presented showing that Plaintiff violated the public trust. No evidence was presented demonstrating that Plaintiff's subordinates in the Department could not follow Plaintiff's lead. No evidence was presented that Plaintiff had a significant disciplinary history requiring termination. Instead, the evidence demonstrated that Plaintiff's disciplinary history consisted of minor infractions resulting in verbal or written counseling. (VOB 01226-01227). Indeed, Ross failed to present any evidence of prior major discipline of Plaintiff.

In addition, Bolingbrook uses a progressive discipline system. (VOB 01226). The progressive discipline system starts with the lowest form of discipline, a verbal or written counseling, and then moves to suspensions and eventually to termination. (VOB 01226-01227). Plaintiff was never suspended or terminated prior to this incident. (VOB 01227). The record lacks evidence of a sufficient basis for the Board's decision that cause for Plaintiff's termination exists. As such, the decision of the Board should be reversed.

## CONCLUSION

For the reasons stated above, the Board committed reversible error in terminating the employment of Plaintiff. The Board's findings that just cause existed to terminate Plaintiff's employment also were against the manifest weight of the evidence and should be reversed.

**WHEREFORE**, Plaintiff respectfully requests that the Board's findings and decision that just cause existed to terminate Plaintiff's employment be reversed and Plaintiff be reinstated to his position at the Village of Bolingbrook Police Department.

Respectfully submitted,


/s/ Monifa K. Gray
Attorney for Plaintiff Willie McRay

Laura L Scarry
Monifa K. Gray
DeANO & SCARRY, LLC
53 W. Jackson Blvd.
Suite 740
Chicago, IL 60604
Tel: (630) 690-2800