| | | |
|---|---|---|
| WILLIE MCRAY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 01588 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| THOMAS ROSS, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

After he was fired from the Bolingbrook Police Department, Sergeant Willie McRay brought suit against the police chief, the Village of Bolingbrook, and a host of others, challenging the firing on a variety of state and federal law grounds.[1] R. 18, Am. Compl.[2] McRay's fourteen-year career with the department ended after a hearing in front of the Board of Fire and Police Commissioners, which determined that he had violated a number of departmental rules. Am. Compl. Exh. A. The primary disciplinary charge against McRay arose out of his relationship with his young-adult son, Jeremy McRay. Admin. R. at 722, Hrg. Tr. at 83.[3] Now, even as the parties are engaged in discovery on the federal law claims, McRay moves for summary judgment on the state administrative-review claim. R. 59, Pl. Br. The

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331. As explained in more detail below, *see infra* Section III.A, supplemental jurisdiction applies to the state law administrative-review claim. 28 U.S.C. § 1367. *See also City of Chi. v. Int'l College of Surgeons*, 522 U.S. 156, 169 (1997).

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number when applicable.

[3]Citations to the Administrative Record are noted as Admin. R. followed by both the page number in the overall paginated record as well as the particular document cited to.

Defendants oppose the motion, arguing that this federal court is not the correct forum for review and, even if it is, the Board's decision should not be disturbed. R. 77, Def. Resp. at 8, 14-18. For the following reasons, McRay's motion is granted. The Board's decision is vacated and remanded.

## I. Background

In late 2003, the Village of Bolingbrook hired Willie McRay as a patrol officer, and he eventually climbed the ranks to patrol sergeant in April 2014. Admin. R. at 1, Initial Charges at 1; Admin. R. at 721, Hrg. Tr. at 78. Before the events culminating in the Board hearing, McRay had performed his duties satisfactorily, as reflected in his performance evaluations for the preceding decade. *Id.* at 1130, Hrg. Tr. at 1122; *id.* at 1223-24, Hrg. Tr. at 1259-63.

McRay's troubles in the department began with his son's June 2015 conviction for possession with intent to distribute a look-alike substance, a Class 3 Felony. Admin. R. at 2, Initial Charges at 2; *id.* at 347-50, Criminal Sentence Ord. at 1-4. Jeremy McRay, who was 19- to 20-years-old during this time, struggled with an addiction to prescription pills. *Id.* at 53-54, McRay Int. Tr. at 29-30; *id.* at 769, Hrg. Tr. at 204-05. When Jeremy was again arrested in September 2015 and charged, this time with felony burglary, he told the arresting officer that he lived with his father, a police officer. Admin. R. at 2, Initial Charges at 2. During the ensuing investigation, Bolingbrook detectives learned of Jeremy's prior felony drug conviction and overheard recorded telephone conversations between McRay and Jeremy, including one where McRay mentioned that he had warned Jeremy about

2

decoy cars and undercover units. *Id.* at 351, Internal Investig. Memo. at 1; *id.* at 723, Hrg. Tr. at 87. Based on the recorded conversations, Public Safety Director Tom Ross launched a formal investigation, but the investigation ultimately concluded that any allegation of misconduct was unfounded. *Id.* at 351, Internal Investig. Memo. at 1. But the investigation into the recordings brought Jeremy's larger problems to Director Ross's attention. *Id.* at 722, Hrg. Tr. at 84.

After learning of the felony conviction in September 2015, Ross approached McRay to discuss Jeremy's criminal history. Admin. R. at 723, Hrg. Tr. at 86-87. During that meeting, Director Ross said that McRay's relationship with Jeremy violated a departmental rule against certain associations set forth in a specific departmental order, General Order 12. *Id.*, Hrg. Tr. at 88-89. General Order 12 contains a list of various offenses that can subject a police officer to departmental discipline. Among those is a ban on relationships with persons who have criminal histories or who are under investigation:

> [R]egular or continuous associations or dealings with persons [Employees] know, or should know, are persons under criminal investigation or indictment, or who have a reputation in the community or the Department for present involvement in felonious or criminal behavior.

Admin. R. at 13, General Order No. 12, § VII, ¶ 8(B). Paragraph 8(B) also contains exceptions, including:

> Exceptions: when as necessary to the performance of official duties, or where unavoidable because of other family or personal relationships of the employees'.

*Id.* Finally, the rule requires an officer to notify the Chief of Police if a family or personal relationship is the basis for an exception to the ban:

If such family or personal relationships exist, then the employee shall make notification to the Chief of Police, via memorandum.

*Id*, General Order No. 12, § VII, ¶ 8(C).[4]

When confronted with the policy, McRay told his supervisors that his son did not live with him, and in late September 2015, he submitted a memo to the Director making that representation. Admin. R. at 2, Initial Charges at 2; *id.* at 723-24, Hrg. Tr. at 89-91; *id.* at 1269, McRay Memo. at 1. Ross responded with a memo of his own, acknowledging McRay's written notice, and advising him that the association restriction, General Order No. 12, § VII, ¶ 8(B) and (C), applied to his situation. *Id.* at 3, Initial Charges at 3; *id.* at 724, Hrg. Tr. at 92-93; *id.* at 1270, Ross Memo. at 1. Ross's memo also asked McRay to keep Ross "advised of all changes and updates." *Id.* at 1270, Ross Memo. at 1. When asked later (at the Board hearing) what he meant by this, Ross answered, "the document speaks for itself." *Id.* at 725, Hrg. Tr. at 94. Director Ross testified that he told McRay only that the rule applied to his situation. *Id.* at 726, Hrg. Tr. at 100. According to Ross, "it was not an explicit order" that McRay stay away from his son. *Id.*

After the September 2015 memo exchange between McRay and Ross, Jeremy had several other run-ins with the police. In July 2016 (at that time, Jeremy was on pretrial release for the pending burglary charge), the Naperville police department had a 911 call come from Jeremy's cell phone. Admin. R. at 784, Hrg. Tr. at 263. When emergency services dialed back, Jeremy did not pick-up, and GPS was traced

---

[4]As the Director of Public Safety, Tom Ross acted as both the Chief of Police and the Chief of the Fire Department in Bolingbrook, Illinois. *See* Admin. R. at 725, Hrg. Tr. at 96-97.

back to McRay's Bolingbrook address, where Jeremy was found. *Id.* at 833, Hrg. Tr. at 377. According to McRay, Jeremy had gotten a flat tire the day before, and McRay let him spend the night at his Bolingbrook home—which was closer than his usual home at his mother's Plainfield residence—so it could be fixed in the morning. *Id.* at 527, McRay 7/13/16 Memo. at 1; *id.* at 728, Hrg. Tr. 108-09.

The whole situation came to a head in August 2016. McRay, away in Arizona on vacation, asked Jeremy to go to McRay's Bolingbrook home to check on his dogs. Admin. R. at 41-42, McRay Int. Tr. at 17-18. Unbeknownst to McRay, Jeremy hosted a party at the house that night. At the party, a woman reported being sexually assaulted and numerous items were stolen from McRay's house. *Id.* at 3, Initial Charges at 3; *id.* 729-30, Hrg. Tr. at 113-15. After the thefts, Director Ross claimed McRay had failed to file police reports with the department and had not been forthcoming with information about the incident. *Id.* at 730, Hrg. Tr. at 114-15. McRay eventually filed police reports stating that his badge and hat shield had been stolen. *Id.* at 646, Board Ord. at 5. At that point, Ross initiated a formal complaint against McRay, beginning the investigation that would end in McRay's eventual discharge. *Id.* at 730, Hrg. Tr. at 116; *id.* at 1274, Serv. Complaint at 1. McRay was put on administrative leave from the Bolingbrook Police Department, but was ordered to contact his Patrol Commander by 9 a.m. on the days he was scheduled to work; he failed to do that on two days in September 2016. *Id.* at 4, Initial Charges at 4; *id.* at 822, Hrg. Tr. at 332-33.

After McRay was served paperwork of the Department's internal investigation into his conduct, fellow Bolingbrook officers searched his locker and desk at the department. Admin. R. at 341, Hess Timeline Memo. at 2. They found a bottle of prescription Hydrocodone, prescribed to Jeremy, in McRay's desk. *Id.* at 341, 343, Hess Timeline Memo. at 2, 4. The officers confiscated the pills. *Id.* at 741, Hess Timeline Memo. at 2.

Another incident happened in around October 2016. McRay's dog was involved in a fight with a neighbor's dog. Admin. R. at 603, Am. Charges at 4. Under Bolingbrook ordinances, McRay's dog should have been impounded, but McRay refused to turn his dog over to the Village. *Id.* at 604, Am. Charges at 5. McRay testified that he had moved the dog out of town, because his house was for sale and McRay refused to build a fence that would be necessary to release his dog from impoundment. *Id.* at 646, Board Ord. at 5.

Eventually, the Department notified McRay that Director Ross brought disciplinary charges against him before the Bolingbrook Fire and Police Commission. *See* Admin. R. at 1-9, Initial Charges at 1-9. The list of accusations included: failure to obey orders; possession of a controlled substance; association with restricted persons under criminal investigation; failure to cooperate with a police investigation; failure to comply with general orders; insubordination; failure to report the loss of municipal property; failure to maintain a working knowledge of the regulations of the police department; and failure to maintain conduct expected of an officer. *Id.*

After an evidentiary hearing, the Board found McRay guilty of each offense except the failure to report the theft of municipal property. It found that McRay's misconduct constituted a "substantial shortcoming" that prevented him from holding a sergeant's position. Then, the Board ordered that McRay be discharged from the Bolingbrook Police Department. Admin. R. at 687-88, Suppl. Board Ord. at 1-2.

## II. Standard of Review

The Illinois Administrative Review Law provides for judicial review of administrative agency decisions. 735 ILCS 5/3-110. Factual findings are presumed "to be prima facie true and correct," *id.*; *Richard's Tire Co. v. Zehnder*, 692 N.E.2d 360, 366 (1998), which means that the findings remain intact unless they are against the manifest weight of the evidence, *Roman v. Cook Cty. Sheriff's Merit Board,* 17 N.E.3d 130, 153 (Ill. App. Ct. 2014). The manifest-weight standard is not satisfied "merely because an opposite conclusion might be reasonable." *Id.* But even under the manifest-weight standard, the deference given to the agency's decisions is not "boundless." *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 917 N.E.2d 999, 1011 (Ill. 2009) (quoting *Wade v. City of N. Chi. Police Pension Board*, 877 N.E.2d 1101, 1114 (2007)). The review "cannot amount to a rubber stamp of the proceedings below." *Bowlin v. Murphysboro Firefighters Pension Board of Trustees*, 857 N.E.2d 777, 782 (Ill. App. Ct. 2006). Although a decision may be "supported by some evidence, which if undisputed would sustain the administrative finding, it is not sufficient if upon a consideration of all the

evidence, the finding is against the manifest weight." *Id.* A reviewing court should not "hesitate to grant relief" when a record lacks the "evidentiary support for the agency's determination." *Id.*

An agency's decision on a question of law is reviewed *de novo. Richard's Tire Co.*, 692 N.E.2d at 366. The agency's decisions on mixed questions of law and fact get some deference, with reversals reserved for those that are "clearly erroneous"— that is, when the reviewing court, on the entire record, is "left with the definite and firm conviction that a mistake has been committed." *AFM Messenger Serv., Inc. v. Dep't of Emp't Sec.*, 763 N.E.2d 272, 280-81 (Ill. 2001) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## III. Analysis

### A. Subject Matter Jurisdiction

In a federal case, it is always the first order of business to make sure that subject matter jurisdiction applies. Here, McRay's administrative-review claim is covered by supplemental jurisdiction. 28 U.S.C. § 1367(a). Defendants half-heartedly "question" whether supplemental jurisdiction applies, arguing that precedent is "somewhat murky" on whether § 1367 authorizes a federal court to review a state administrative decision. Def. Resp. at 8. But Supreme Court case law is clear: it matters not, for jurisdictional purposes, that a state administrative decision is the subject of the supplemental claim. Section 1367 "generally confers" supplemental jurisdiction over "all other claims" in the same "case or controversy as a federal question, without reference to the nature of review." *City of Chi. v. Int'l*

*College of Surgeons*, 522 U.S. 156, 169 (1997). *International College of Surgeons* interpreted a prior case, *Chi. R.I. and P.R. Co. v. Stude,* 346 U.S. 574, 582 (1954) (cited by Def. Resp. at 8), to mean only that a litigant cannot split a challenge to a state administrative decision by bringing a federal-court action for damages while the underlying substantive decision was still under review in state court. 522 U.S. at 169-70. "There is nothing in the text of § 1367(a) that indicates an exception to supplemental jurisdiction for claims that require on-the-record review of a state or local administrative determination." *Id.* at 169. So there is nothing in § 1367(a) that would prevent the Illinois Administrative Review Law claim from being premised on supplemental jurisdiction.

It is possible (subject to the Supremacy Clause) that a state law could prohibit other courts from hearing the merits of a state-law claim, but Illinois's Administrative Review Law does not do that. *See* 735 ILCS 5/3-101 *et seq*. To be sure, in pertinent part, the jurisdictional provision states: "Jurisdiction to review final administrative decisions is vested in the Circuit Courts ..." 735 ILCS 5/3-104. And the statute refers to "Circuit Court[s]" in describing what judicial review comprises when evaluating an administrative decision. 735 ILCS 5/3-111(a). But there is no textual command that the jurisdiction grant is *exclusive* to Illinois state trial courts—and neither party contends otherwise. This statutory framework is similar to the Illinois Human Rights Act, which states that aggrieved parties "may commence a civil action in an appropriate Circuit Court ... ." 775 ILCS 5/10-102(A)(1). Again, there is no reference to federal courts, but Illinois Human Rights

Act claims are routinely brought in federal court under the aegis of § 1367(a) supplemental jurisdiction, *see, e.g.*, *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 600 (7th Cir. 2006), or even directly under diversity jurisdiction, *see, e.g.*, *Richards v. U.S. Steel*, 869 F.3d 557, 562 (7th Cir. 2017). The similar provisions of the Illinois Administrative Review Law ought to have the same result: supplemental jurisdiction does apply to McRay's claim for administrative review.

## B. Due Process

Moving on from subject matter jurisdiction, McRay first contends that the Board's findings must be reversed because the charges against him were "unconstitutionally vague and ambiguous." Pl. Br. at 8. Both the federal and state due process clauses require a sufficiently definite charge, adequate notice, and a fair and impartial hearing. *Burns v. Police Bd. of City of Chi.*, 432 N.E.2d 1300, 1303 (Ill. App. Ct. 1982). In an administrative proceeding, the charges need not be drawn with the "same precision required of pleadings in judicial proceedings." *Id*. In *Burns,* the Illinois Appellate Court held that administrative pleadings violated due process when the charges informed the supposed offender only of the date of his alleged wrongful actions and a vague description of the transgression—the document was devoid of any information on location, time frame, or victim. *Id.* Here, McRay contends that the Amended Charges were not "sufficiently written" to notify him of the "charges against him" or allow him to "prepare a defense." Pl. Br. at 9.

A review of the document shows otherwise. The Amended Charges detail McRay's alleged conduct, with specific dates and time frames, as well as his son's contact with the Police Department, all leading up to McRay's evidentiary hearing. Admin. R. at 600-08, Am. Charges at 1-9. Over the course of several pages, the allegations are divided into paragraphs, asserting pertinent facts that call into question McRay's conduct as a police officer. The charges do much more than merely list the rules that McRay allegedly broke by associating with his son—the document sets forth extensive factual detail. *Id.* It then describes the alleged violations of the Department's rules, contained in General Order 12, that could lead to McRay's discipline. *Id.* at 604-05, Am. Charges at 5-6. To be sure, the charging document does not always draw direct lines from McRay's specific actions to the particular subsections of General Order 12, *id.*, but the factual details and the particular rules are all contained in the Amended Charges. The charges levied against him are not vague or ambiguous.[5]

## C. Manifest Weight of the Evidence

An agency's decision to discharge an employee for "cause" is entitled to deference. *See Walsh v. Board of Fire and Police Com'rs of Village of Orland Park,* 449 N.E.2d 115, 117 (Ill. 1983). Judicial review of a discharge decision comprises two steps. *Walker v. Dart,* 30 N.E.3d 426, 435 (Ill. App. Ct. 2015). The first step is to

---

[5] It is worth nothing that McRay also had the benefit of legal representation throughout the administrative process, from his pre-hearing interview to the evidentiary hearing itself. His counsel never challenged the sufficiency of the charges or raised any arguments about perceived vagueness. *See generally* Admin. R.

determine whether the agency's "findings of fact are contrary to the manifest weight of the evidence." *Id.* (quoting *Marzano v. The Cook County Sheriff's Merit Board*, 920 N.E.2d 1205, 1208 (Ill. App. Ct. 2009)); *see Walsh,* 449 N.E.2d at 117 (determining whether "the agency's finding of guilt is contrary to the manifest weight of the evidence"). The second step is to evaluate whether the agency's "findings of fact provide a sufficient basis for its conclusion that cause for discharge exists." *Walker,* 30 N.E.3d at 435. "Cause" for a firing must be "some substantial shortcoming" that renders an officer's continuing employment "in some way detrimental to the discipline and efficiency of the service" and that the "law and a sound public opinion recognize as a good cause." *Marzano,* 920 N.E.2d at 1208 (quoting *Walsh,* 449 N.E.2d at 117). Generally speaking, the Board itself is in the best position to determine the effect of an officer's conduct on the department. *Hermesdorf v. Wu,* 867 N.E.2d 34, 43 (Ill. App. Ct. 2007). So it is afforded "considerable deference" to its discharge finding, and it will be overturned only if it is "arbitrary and unreasonable or unrelated to the requirements of the service." *Marzano*, 920 N.E.2d at 1208.

Here, the Board determined that McRay violated eight different sections of General Order 12, including: continuing a prohibited association; possessing a controlled substance; failing to cooperate with a police investigation; disobeying orders and insubordination; failing to read, comply, and maintain knowledge of the department rules; and engaging in conduct adversely affecting the morale of the department. Admin. R. at 679-84, Am. Board Ord. at 1-6; *id.* 11-19, General Order

No. 12. Despite the myriad violations, the Board's decision really boils down to four factual findings: (1) McRay's continued contact with his son Jeremy; (2) possession of Jeremy's prescription medication; (3) failure to report stolen items from McRay's household; and (4) resistance to impounding his dog. The Court examines each finding in turn.

### 1. Association with Son

Starting with the charge that sparked the entire investigation, McRay's relationship with his son serves as the foundation for many of the allegations. The Board sustained the charge that McRay violated the rule against association with criminal suspects. Admin. R. at 680, Am. Board Ord. at 2. Specifically, the rule requires that officers avoid "regular and continuous" associations with people under criminal investigation or who have a reputation for criminal behavior. *Id.* at 680, Am. Board Ord. at 2; *id.* at 13, General Order No. 12, § VII, ¶ 8(B). The Board based its conclusion that McRay violated this rule on the following findings: (1) Jeremy was a convicted felon with involvement in other criminal behavior; (2) McRay was aware of the rule; (3) the rule applied to McRay's relationship with Jeremy without exception; and (4) McRay had regular and consistent associations with Jeremy, because Jeremy lived with McRay. *Id.* at 680-81, Am. Board Ord. at 2-3. The Board also found that McRay violated a direct order to provide reports about his relationship with his son. *Id.* at 681, Am. Board Ord. at 3. For the reasons detailed below, the Court concludes that, even giving the Board the considerable deference

owed to it, the Board committed clear error in finding that Ross correctly applied the rule to McRay's relationship with Jeremy.

To unpack this, start with the undisputed fact that Jeremy did have a felony conviction as of September 2015. After Director Ross learned of that criminal history and also learned that Jeremy was facing another felony charge (this time for car burglary), Ross met with McRay to question him about the extent of McRay and Jeremy's contact. Admin. R. at 723, Hrg. Tr. at 86-89. The focus of the questioning was where Jeremy lived. *Id.* McRay explained that Jeremy primarily lived with his mother, McRay's ex-wife Diana, in Plainfield, Illinois. *Id.* At that point, Ross told McRay that "General Order 12 applied to him," which meant (at least to Ross's way of thinking) that McRay's relationship with Jeremy was covered by the rule. *Id.*

After that meeting, two key documents come into play: McRay's memo to Director Ross, and Ross's responsive memo. Admin. R. at 1269, McRay Memo. at 1; *id.* at 1270, Ross Memo. at 1. Remember that the exception to the criminal-association ban allows for associations that are "unavoidable because of other family or personal relationships," *id.* at 13, General Order No. 12, § VII, ¶ 8(B), but the officer "shall make notification to the Chief of Police, via memorandum," *id.*, § VII, ¶ 8(C).[6] McRay's memo focused primarily on Jeremy's living arrangements, explaining that, before his arrest, Jeremy lived with his mother "a majority of the time," but had been "temporarily staying" with McRay due to a fight between Jeremy and his mother. Admin. R. at 1269, McRay Memo. at 1. In the memo,

---

[6]The rule does not dictate a timeline for submitting the memo, and there is no reason to believe that its submission was untimely. *See* Admin. R. at 13, General Order 12 § VII, ¶ 8(C).

McRay stated that Jeremy would not "permanently reside at my Bolingbrook residence." *Id.*[7] Ross responded that same day—in a succinct, three-sentence memo—simply repeating his viewpoint that McRay's relationship with Jeremy "does fall within General Order 12, § VII, ¶ 8, parts B & C." *Id.* at 1270, Ross Memo. at 1. Ross's response also stated, "please keep me advised of all changes and updates"—but the memo did not explain specifically what that meant. *Id.*

The Board committed clear error in finding that this series of events amounted to a violation of the criminal-association ban or an order from Ross (or a combination of both). The rule contains an explicit exception: "where unavoidable because of other family or personal relationships of the employees." Admin. Tr. at 13, General Order No. 12, § VII, ¶ 8(C). So McRay's family relationship with Jeremy qualified for the exception. The rule requires McRay to notify the Chief of Police "via memorandum." *Id.* He did that. Yet Ross's only written response was to simply say that the relationship "does fall within General Order 12, § VII, paragraph 8, parts B & C." Admin. R. at 1270, Ross Memo. at 1. Part C is the exception to the criminal-association ban, so what was McRay to make of that statement? Ross's memo did not further explain how the rule applied; did not assert that McRay's relationship was outside the family-relationship exception; and did not describe what "changes

---

[7]This was after Ross had already approached McRay about Jeremy's criminal history, so it is inconsequential that McRay did not rehash that history. Nor does the rule specifically prescribe what the memo must include. Admin. R. at 13, General Order No. 12, § VII, ¶ 8(C); *see Jackson v. Board of Educ. of City of Chi.,* 53 N.E.3d 381, 389 (Ill. App. Ct. 2016) (holding termination against the manifest weight of the evidence, because omission of discharge on job application was not intentional when application did not require disclosure). The memo described the living situation, which was what Ross focused on in the meeting. *See* Admin. R. at 1269, McRay Memo. at 1.

and updates" Ross wanted to know about. Indeed, at the evidentiary hearing in front of the Board, when asked what the "changes and updates" request meant, Ross answered only that the "document speaks for itself." *Id.* at 725, Hrg. Tr. at 94. No, it does not.

Moving on from the rule itself and Ross's memo, the Board argues that, at the September 2015 meeting, Ross verbally advised McRay that the family-relationship exception did not apply to McRay. But the exception plainly does apply: the text of the provision says that the criminal-association ban does not apply "where unavoidable because of other family or personal relationships of the employees." Admin. R. at 13, General Order No. 12, § VII, ¶ 8(C). Ross's interpretation of the exception made no sense. Indeed, at the evidentiary hearing, Ross explained what he tried to convey in his response memo by citing to Paragraphs 8(B) and 8(C): McRay "can't associate with a known felon. He can't associate with someone under criminal investigation or somebody under indictment." Admin. R. at 724, Hrg. Tr. at 93. To say that McRay "can't associate with a known felon" would mean that McRay could *never* spend time with his son, because Jeremy was (and always will be) a "known felon." Yet the rule does not even specifically ban associating with someone just because they have been convicted of a felony in the *past*. Rather, it prohibits contact with people "under criminal investigation or indictment, or who have a reputation in the community or the Department for *present* involvement in felonious or criminal behavior." Admin. Tr. at 13, General Order No. 12, § VII, ¶ 8(B) (emphasis added); *see Walker,* 30 N.E.3d at 436 (highlighting the importance of the

restrictions described in the actual text of the "general orders and rules" governing officers when determining violations). The Board clearly erred in affirming Ross's interpretation and application of the criminal-association ban and the family-relationship exception.

To make matters worse, Ross in fact never directly ordered McRay not to associate with Jeremy and never told McRay the limits of the association. Admin. R. at 726, Hrg. Tr. at 99-100 (Q. Did you order Sergeant McRay to not associate with Jeremy except where unavoidable? A. I told Sergeant McRay that General Order 12, that specific section applied to him and that he needed to keep me apprised of any changes or any updates. So it was not an explicit order."); *id.* at 769, Hrg. Tr. 204-05 ("There are a lot of reasons why you might have to have contact with your son, but they're severely limited …"). When asked at the hearing why the family-relationship exception did not apply, Ross resorted to *ipse dixit*, answering:

> The exception doesn't apply because—and it's a case by case interpretation, but *when I say it doesn't apply, it doesn't apply*. It's an interpretive general order … . I was asked if it could apply. I told him it didn't apply. The exception doesn't apply. It's not unplanned. It's not incidental. Done.

Admin. R. at 838, Hrg. Tr. at 398 (emphasis added). At best, without any textual support in the rule and its exception, Ross is saying that *any* "unplanned" contact between McRay and Jeremy would violate the association ban. At worst, Ross is saying that whatever he says, goes.

In trying to defend Ross's interpretation, the Board cites cases that affirmed discharges where officers began romantic relationships with (and later married) persons with criminal histories. Def. Resp. at 12-13; *see Merrifield v. Ill. State Police*

*Board*, 691 N.E.2d 191, 199 (Ill. App. Ct. 1998) (upholding Board's termination decision where officer married a felon, even after the police department brought the felony to the officer's attention and forbade the relationship); *Bautista v. County of Los Angeles*, 118 Cal. Rptr. 3d 714, 717 (Cal. Ct. Appl. 2010) (upholding firing where officer moved in with, and later married, a well-known heroin addict and sex worker). Those cases are different from McRay's, because it is possible to *not* start a romantic relationship or friendship with a criminal, but McRay's family relationship with Jeremy was not a matter of choice. The evidence does not support that McRay's relationship with Jeremy falls outside of the family-relationship exception, or that McRay otherwise violated a rule or directive. The Board committed clear error in affirming this basis for the firing. And several other grounds for the firing were premised on the flawed finding: failing to "understand or comply" with all "rules and regulations, general and special orders, policies and procedures of the Department," Admin. R. at 15, General Order 12 § VII, ¶ 22; *id.* at 682, Am. Board Ord. at 4[8]; being insubordinate by failing to "obey a lawful order given by a supervisor," Admin. R. at 17, General Order 12 § VII, ¶ 36; *id.* at 683, Am. Board Ord. at 5[9]; engaging in conduct "which adversely affect[ed] the morale or efficiency

---

[8]The Board also found this violation related to the possession of a controlled substance and the failure to cooperate with a police investigation. Admin. R. at 682, Am. Board Ord. at 4. The findings for those events are not against the manifest weight of the evidence.

[9]Like the failure to understand and comply with the rule, the Board also sustained the insubordination violation related to the possession of a controlled substance and the failure to cooperate with a police investigation. Admin. R. at 682, Am. Board Ord. at 4. The findings for the failure to cooperate are not against the manifest weight of the evidence. The insubordination charge for the controlled substance possession is discussed later in the Opinion.

of the Department … or has a tendency to destroy public respect for the employee and/or Department," Admin. R. at 16, General Order 12 § VII, ¶ 22; *id.* at 682, Am. Board Ord. at 4; and failing to "establish and maintain a working knowledge of laws, rules and regulations, policies and procedures … of the Bolingbrook Police Department," Admin. R. at 19, General Order 12 § VII, ¶ 22; *id.* at 683, Am. Board Ord. at 5.[10]

## 2. Possession of Prescription Medication

Moving on to the rules violations that did not hinge on McRay's family relationship with Jeremy, the General Order disallows the "possession and/or use of controlled substances or medications." Admin. R. at 12, General Order 12, § VII, ¶ 4. The reason for such a rule is obvious: officers under the influence of controlled substances could "impair[] or compromise[] the efficiency and integrity of the Department." *Id.*

When officers searched McRay's work desk in September 2016, they recovered a bottle of hydrocodone (a narcotic) prescribed to Jeremy. Admin. R. at 997-98, Hrg. Tr. 764-765. Even if McRay was holding onto the medication to keep it away from his drug-addicted son, McRay admitted that he did not report the possession to his supervisor. Admin. R. at 815-16, Hrg. Tr. at 307-08; *id.* at 998, Hrg. Tr. at 765. And it is irrelevant that McRay never took or was accused of ingesting any of the controlled substance—the rule unequivocally bans unauthorized "possession." *Id.* at 12, General Order 12, § VII, ¶ 4. The Board's

---

[10]The Board did not make any factual findings with regard to this specific charge. It merely found the "charge sustained based upon the facts discussed herein." Admin. R. at 683, Am. Board Ord. at 5.

finding that McRay violated this provision is affirmed. On remand, the Board may consider what discipline (including termination) is warranted by this violation.

But the Board's additional finding that McRay was insubordinate with regard to the possession is against the manifest weight of the evidence. The Board did not describe any way in which McRay "failed or deliberately refused to obey a lawful order given by a supervisor." Admin. R. at 17, General Order 12, § VII, ¶ 36 (cleaned up).[11] And the record does not suggest insubordination with regard to the possession. So the consideration of discipline on remand must be limited to the possession itself.

### 3. Failure to Cooperate with Police Investigation

After Jeremy held his unauthorized party at the Bolingbrook home while McRay was out of town, either Deputy Chief of Police Ken Teppel or Commander Dennis Hess informed McRay of the party and the thefts from his home. Admin. R. at 818, Hrg. Tr. at 316-17. A number of McRay's personal items had been stolen from the house, including several television sets, watches, syringes, a guitar, a handgun magazine, ammunition, and shoes. *See* Admin. R. at 967-69, Hrg. Tr. at 730-35; *id.* at 995-96, Hrg. Tr. at 756-58. Teppel asked McRay to file a police report on the theft. *Id.* at 819, Hrg. Tr. at 320. Although McRay did eventually write a *memo* about the stolen property, he never filed a police report on the personal items

---

[11]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See, e.g.*, *United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017).

stolen from his home.[12] At the evidentiary hearing before the Board, McRay reasoned that the department was already aware of the thefts, and that he "knew the director was out to get me, that's why I didn't file it." *Id.* at 969, Hrg. Tr. at 736; *id.* at 996, Hrg. Tr. at 760.

That explanation does not justify refusing to file the police report, or at least the Board did not commit clear error in finding the violation. The General Order requires officers "to fully cooperate with a police investigation." Admin. R. at 13, General Order No. 12, § VII, ¶ 9. McRay's superiors in the police department asked him to file a police report about the stolen items. At that time, there was an ongoing investigation, not only into the thefts, but into a sexual assault alleged to have taken place during the party. *Id.* at 1002-03, Hrg. Tr. at 784-85. So a police investigation was ongoing. Whatever McRay's reasons for not wanting to file a report, his defiance amounted to a refusal to cooperate in the investigation. And even though he reported some items missing, he did not file the police report on his personal items—so he did not "fully cooperate" with the investigation. Admin. R. at 13, General Order No. 12, § VII, ¶ 9. The Board had sufficient evidence to find that McRay failed to fully cooperate with a police investigation, so that charge is sustained, and the Board may consider it on remand.

---

[12]The Board did not sustain charges that McRay had failed to report the loss of municipal property or equipment. Admin. R. at 683, Am. Board Ord. at 5. McRay did, in fact, report the badge and hat shield stolen. *Id.* at 968-69, Hrg. Tr. at 734-35; *id.* at 1275, McRay Missing Items Memo. at 1. He also confirmed that his other badges and uniforms were accounted for, complying with Deputy Chief Teppel's request. *Id.* at 1049, Hrg. Tr. at 892-93.

### 4. Violation of Ordinance

The final set of events leading to McRay's discharge arose from an altercation between McRay's and his neighbor's dogs. As previously discussed, McRay's dog broke through the fence separating McRay's house from his neighbor's, and the dog got into a fight with the neighbor's dog. Admin. R. at 874, Hrg. Tr. at 445. At the evidentiary hearing, Bolingbrook's Animal Control Supervisor testified about the various Village ordinances on pets. *Id.* at 873, Hrg. Tr. at 443. She explained that when a dog seriously injures another one, that dog normally is impounded under the dangerous-animal ordinance. *Id.* at 874, Hrg. Tr. at 447; *see id.* at 1282-86, Animal Ordinance at 3-7. When Animal Control tried to impound McRay's dog, he refused to turn the animal over, arguing that he did not believe the dog was vicious and explaining that he had given it to a friend outside of Bolingbrook. *Id.* at 875, Hrg. Tr. at 450. Even when told that the ordinance applied to his dog, McRay refused to comply. *See id.* at 883, Hrg. Tr. at 482.

McRay asserts that he was not informed specifically about the dangerous-animal ordinance. Instead, McRay testified that he was told that the dog's impoundment was only necessary until his fence was fixed—but McRay was selling his house and had no intention of fixing the fence. Admin. R. at 1117-18, Hrg. Tr. at 1071-73. So rather than turn over the dog to be impounded, McRay moved it to another location to get around the fencing problem. *Id.* But in light of the deference owed to administrative decisions, the Board was entitled to find that McRay did not satisfactorily comply with the dangerous-animal ordinance. *Id.* at 682-83, Am.

Board Ord. at 4-5. Under the ordinance, Animal Control cited McRay for owning a "vicious dog" (and McRay paid the citation). *Id.* at 1117-18, Hrg. Tr. at 1071-73. Under the ordinance, a dog that is "found to be a vicious dog and which is not confined to an enclosure shall be impounded." *Id.* at 1285, Animal Ordinance at 6, § 21-110(D). It was not clearly erroneous for the Board to find that McRay violated the ordinance by refusing to submit the dog for impoundment. Based on that outright refusal to comply with the ordinance, the Board reasonably found, given the deference owed to the Board, that McRay engaged in conduct that "adversely affects the morale" of the department and "destroy[s] public respect" for the department. Admin. R. at 16, General Order No. 12, § VII, ¶ 33. The charge is sustained, and on remand, the Board may consider that charge for discipline.

### 5. Discharge Decision

With an important pillar of the Board's discharge decision vacated, the next question is whether the affirmed findings provide "cause" for the firing. *See Walker,* 30 N.E.3d at 435; *Harder v. Village of Forest Park,* 2008 WL 4561631, at *7-8 (N.D. Ill. May 2, 2008); *Roman,* 17 N.E.3d at 170. But rather than deciding that in the first instance, however, the Court will exercise its discretion under the Illinois Administrative Review Act and remand to the Board to give it the first chance to decide whether the vacatur of the criminal-association finding leaves enough to fire McRay. Under the Act, the reviewing Court has the authority to remand:

> (5) to affirm or reverse the decision in whole or in part;
>
> (6) where a hearing has been held by the agency, to reverse and remand the decision in whole or in part, and, in that case, to state the questions requiring

further hearing or proceedings and to give such other instructions as may be proper … .

735 ILCS 5/3-111(a)(5), (6). Here, the Court has found that the most important finding against McRay was against the manifest weight of the evidence. The question now is whether the remaining violations constitute a "substantial shortcoming" rendering his continued employment as an officer "detrimental to the discipline and efficiency of the service." *Marzano,* 920 N.E.2d at 1208 (quoting *Walsh*, 449 N.E.2d at 117); *see also Roman,* 17 N.E.3d at 169-71. It is better for the Board to decide that in the first instance.

### D. Other Constitutional Claims

As a final note: McRay urges the Court to dive into the constitutionality of the Department's prohibition on relationships with persons under criminal investigation or engaged in criminal behavior. Pl.'s Br. at 10-14. Specifically, McRay argues that the ban on associating with his son violated his due process rights and that the rule itself is unconstitutionally vague and ambiguous. Pl.'s Br. at 10, 14. But there is no need to decide those issues, because the Court has already held that the finding on the criminal-association rule is against the manifest weight of the evidence. *See Walker,* 30 N.E.3d at 439 ("Since we have held that the Merit Board's decision was against the manifest weight of the evidence, we need not reach the remaining issues on appeal, including whether the drug policy is unconstitutionally vague ... ."). And the lion's share of McRay's federal claims rests on these same questions, so it would be premature to decide those issues before the conclusion of discovery on the federal claims.

# IV. Conclusion

For the foregoing reasons, the motion for partial summary judgment is granted in part and denied in part. The Board's decision to discharge McRay is vacated because the criminal-association finding is against the manifest weight of the evidence. But the decision is remanded to consider what discipline is appropriate based on the other rules violations. The Board must reconvene to determine the appropriate discipline for those violations.

In light of this summary judgment decision, the parties shall confer on what the next procedural step ought to be, and then file a Position Paper (disagreements on the next step may be set forth in the joint filing). It might be appropriate to enter a Rule 54(b) judgment on the state law administrative-review claim, which would trigger the vacatur and remand to the Board, even as the parties continue engaging in discovery on the federal claims. And it would make a lot of sense for the parties to engage in settlement negotiations in light of the decision. There are still a plethora of depositions to be taken, but rather than expend time, resources, and attorney's fees on discovery, creative minds and cooler heads should try to resolve this case. The Position Paper is due by June 11, 2018.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: May 30, 2018